HALL, Judge.
Plaintiff brought this suit against his employer and his employer’s compensation insurer under the Workmen’s Compensation Statute praying for 400 weeks compensation at $35.00 per week plus interest, medical expenses, statutory penalties and *193 attorney’s fees. There was judgment in his favor for compensation at the rate of $35.00 per week during the period from August 30, 1966 through July 24, 1967, with legal interest on each past due installment from due date until paid subject to a credit for all compensation previously paid plus $62.00 medical expenses and all costs. Defendants appealed. Plaintiff neither appealed nor answered the appeal. The matter was submitted to us on briefs without oral argument.
Plaintiff while working as a fry cook for Al Pancraft d/b/a Pann’s Kentucky Fried Chicken slipped and spilled a pot of hot grease on his hand and forearm. The accident happened on August 30, 1966. His employer sent him to Dr. Fortunato Padua for treatment and paid him full wages ($65.00 per week) in lieu of compensation until September 15, 1966, when he discharged him for refusal to perform light work.
The sole question presented is whether plaintiff is entitled to compensation for temporary total disability from September 15, 1966 through July 24, 1967.
Plaintiff was seen on the day of the accident by Dr. Padua, a general practitioner, who found him suffering from first and second degree burns of both hands and part of the right forearm. (Only the right hand and forearm is involved in the case.) Dr. Padua stated that a first degree burn is one which produces only an area of redness while a second degree burn produces blistering. A third degree burn goes much deeper. He testified that a second degree burn, such as plaintifff suffered, would not affect any tendons nor any nerves that motivate the hand nor would it cause any motor dysfunction.
Dr. Padua applied Furacin ointment to plaintiff’s burns, gave him an injection of Kutepressin to aid healing and applied a sterile dressing and an ace bandage. He saw plaintiff the next day and redressed the wounds. They were healing nicely. Dr. Padua rechecked and regreased the wounds on September 6, 1966, removed the bandages, and told plaintiff to return the next day, but plaintiff did not return until September 9th. On that date Dr. Padua found him capable of returning to light work but since there was a scab in the area of the wound on his forearm which might be unsightly and since plaintiff was handling food he left it up to him whether to return to work. He told plaintiff if he did not go back to work to come to see him on September 10th. Plaintiff returned to Dr. Padua’s office on September 13th and again on September 20th. On September 20th plaintiff was still complaining of pain in his arm but Dr. Padua found him fully able to return to full time work as a cook and that he had no residual disability. The scars were well healed at that time and plaintiff had a full range of motion in his arm. Dr. Padua testified that at no time during his treatment did plaintiff exhibit any flexion or contraction of his fingers or wrist and that at no time did any infection or complication develop.
Dr. Padua further testified that he “didn’t think there was any remote possibility he was going to develop a contraction” but could not say whether he actually did or not since the last time he saw him was on September 20th. He acknowledged however that second degree burns could become third degree burns if the affected area was subjected to a blow.
In spite of the fact that plaintiff was discharged to return to work on September 20, 1966, he did not do so. Instead he sought legal advice and his attorney sent him to see Dr. Bernard Richmond, who is also' a general practitioner. In the meanwhile, on or shortly before September 15th, plaintiff had visited his employer who offered to give him light work sweeping and cleaning up but plaintiff refused to do any work at all and his employer discharged him.
Plaintiff first saw Dr. Richmond on October 4, 1966. His chief complaint to Dr. Richmond was that his right wrist and the fingers of his right hand were painful and *194 that he was unable to keep the fingers of his right hand outstretched. Examination by Dr. Richmond revealed scarring of the volar under aspect of the wrist and also healed scars along the top side of the fingers. Since plaintiff kept his fingers flexed Dr. Richmond testified that it was his “concern” that there could be a probable scarring of the flexor tendon which operates the fingers and also possibly an injury to the nerve innovation to the muscle which operates the fingers. He stated that he could not determine this by palpation but that was his impression from the physical findings. He made no x-rays because x-rays show only bones and no bones were involved. He suggested warm soaks and manipulation of the fingers with the left hand, gave plaintiff a prescription for pain and told him to return. On cross-examination Dr. Richmond testified the scars on plaintiff’s wrist were well healed and that they were not tender to' touch or palpation.
Dr. Richmond next saw plaintiff on October 31, 1966. Plaintiff still held his fingers flexed but the doctor testified that although he could easily force them to a fully extended position when he did so plaintiff complained that “it sticks like pins” on the under aspect of the wrist and stated that he preferred to keep his fingers closed to prevent that pin-like sticking. Dr. Richmond found the fingers more flexible. He did not find them cold or numb or blue and found no circulation difficulty. He prescribed a brace to keep the fingers extended.
On November 8, 1966 Dr. Richmond found that plaintiff could extend his fingers without using the left hand, but complained of a pin-sticking sensation when he did so and when he wore the brace. Plaintiff’s condition and complaints were essentially the same when Dr. Richmond saw him on November IS, 1966 and again on December 8, 1966.
On January 31, 1967 Dr. Richmond could see no chance for improvement and felt that he had done all he could as a general practitioner and urged plaintiff to see an orthopedist. Dr. Richmond made arrangements for plaintiff to be examined by Dr. Kenneth Saer, an orthopedic specialist. However an appointment was not scheduled with Dr. Saer until June 1, 1967.
Dr. Saer examined plaintiff on June 1, 1967 and rendered a written report to Dr. Richmond. Shortly after receipt of Dr. Saer’s report Dr. Richmond made arrangements to have plaintiff examined by Dr. Irving Redler, another orthopedist, and set up an appointment for July 24, 1967. Plaintiff was seen and examined by Dr. Redler but Dr. Redler made no written report to Dr. Richmond or anyone else. Neither of the two orthopedists who examined plaintiff at the request of Dr. Richmond were called by plaintiff to’ testify regarding their findings. When defendants learned that a report had been made by Dr. Saer to Dr. Richmond they attempted to introduce the report in evidence but plaintiff’s counsel objected and the Trial Judge sustained the objection. Defendants then made a proffer of the report under the provisions of LSA-C.C.P. Art. 1636.
Dr. Richmond last saw plaintiff on July 24, 1967. He had not seen him since January 31, 1967 and did not know what plaintiff had been doing in the interim. On this last visit Dr. Richmond found plaintiff’s condition essentially the same as it had been on January 31st and still thought plaintiff was suffering from either an injury to a tendon or a nerve or both and concluded it was permanent. However on cross-examination Dr. Richmond acknowledged that contraction of the muscles and ligaments or tendons or any nerve involvement would lie in the field of orthopedic specialists. Dr. Richmond testified that in his opinion plaintiff has a 10% permanent disability of the right hand which would prevent him doing any heavy physical activity.
Plaintiff testified that he went to work on January 19, 1967 as a full time waiter at the New Orleans Athletic Club and was discharged on August 1, 1967. He said the *195 pain in his hand caused him to miss much time from work and thought this was why he was discharged. However Reginald Johnson, the head waiter, testified that plaintiff was discharged by the assistant manager because of some controversy between them. Johnson testified that he was completely unaware that plaintiff had any disability relative to his hand and that plaintiff never complained to anyone about it. He stated that plaintiff often did not show up for the night shift but was a good worker when he did work; that the only complaints he ever received was that plaintiff was slow in presenting the meal checks to the members which was a bad policy. Three months after his discharge from the Athletic Club plaintiff got a job at the Bourbon Orleans Hotel garage. He worked there two months parking cars but said he gave it up on account of his hand. Since then he has done no work except to help out occasionally at parties.
 The sole question presented here is whether plaintiff had any further disability beyond the time he was discharged by Dr. Padua on September 20, 1966 to return to full duty. It is well settled that a compensation claimant, like all other plaintiffs, bears the burden of proving his claim by a preponderance of the evidence. In our opinion plaintiff in this case has failed to bear that burden. The condition of plaintiff’s hand when he first saw Dr. Richmond was essentially the same objectively as it was when Dr. Padua discharged him. However Dr. Richmond was “concerned” that he might have a tendon or nerve involvement simply because plaintiff held his fingers flexed and complained of a pin-pricking sensation in his wrist when he extended them. Dr. Richmond acknowledged that plaintiff’s complaints lay in the field of orthopedics although he thought a general practitioner could relieve them. However when plaintiff’s same complaints persisted Dr. Richmond gave up on January 31, 1967, and sought an orthopedic evaluation thereof. For some reason, not disclosed, Dr. Saer did not see plaintiff until June 1, 1967. The Trial Judge excluded Dr. Saer’s report to Dr. Richmond but when, upon receipt of the report, Dr. Richmond referred plaintiff to another orthopedist (Dr. Redler) the inference is inescapable that Dr. Saer did not concur in Dr. Richmond’s diagnosis. What Dr. Red-ler found is not known because he never made a report. The fact that plaintiff did not call either Dr. Saer or Dr. Redler as witnesses further strengthens the inference that neither of them agreed with Dr. Richmond’s evaluation of plaintiff’s complaints. The Trial Judge was evidently of this opinion otherwise he would not have cut off compensation payments as of July 24, 1967.
Since Dr. Richmond on July 24, 1967 found plaintiff’s hand and his complaints to be the same as they had been on January 31, 1967 and since they had not materially changed since he first saw plaintiff on October 4, 1966, the inference may properly be made that neither of the orthopedists would have concurred in Dr. Richmond’s findings from the beginning.
We do not believe that plaintiff’s work at the New Orleans Athletic Club and at the Bourbon Orleans Hotel garage caused him any pain, certainly not any disabling pain.
We are of the opinion that plaintiff has failed to prove by a preponderance of the evidence that he suffered any disability beyond September 20, 1966, the date of his date of his discharge by Dr. Padua.
For the foregoing reasons the judgment appealed from is reversed and judgment is now rendered in favor of the defendants, Al Pancraft d/b/a Pann’s Kentucky Fried Chicken and The Fidelity and Casualty Company of New York, and against the plaintiff, Eddie Thornton, rejecting said plaintiff’s claims and dismissing his suit; costs of both Courts to be borne by plaintiff-appellee.
Reversed and rendered.